**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL DURWOOD GRIFFITH, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-4109 |
| | § | |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner Michael Durwood Griffith seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction and death sentence for capital murder. Respondent Doug Dretke, director of the Texas Department of Criminal Justice-Correctional Institutions Division, has filed a motion for summary judgment. Having carefully considered the petition, the summary judgment motion, the state court record, the parties' submissions, and the applicable law, this court GRANTS respondent's motion for summary judgment and DENIES Griffith's petition for writ of habeas corpus, entering final judgment by separate order. The reasons for these rulings are set out in detail below.

## I.     Background

On Monday October 10, 1994, Debra McCormick was working with her mother, Mary Jane Ringer, at a flower shop and wedding chapel owned by McCormick and her siblings.

Ringer arrived at the shop at about 7:45 a.m. and prepared to open. She placed approximately $400.00 in cash from the previous weekend in her makeup bag. McCormick, who arrived at about 8:00 a.m., had credit cards belonging to Ringer and her husband. At about 8:15 a.m., Ringer left the shop and locked the door. She and McCormick had a policy of keeping the door locked when one of them was alone in the shop; they would open the door only for people they knew. Petitioner Griffith had previously purchased roses from the flower shop.

Ringer returned to the shop at about 8:45. Ringer found roses and wrapping paper on the counter, which had not been there when Ringer left earlier that morning. Ringer found McCormick lying in the reception hall, covered in blood. McCormick was wearing pants and shoes, but her top had been removed and her bra pulled down. She had stab wounds on her torso. Ringer called 911. She noticed that her makeup bag was open and the cash was missing. 28 Tr. at 25-52. The credit cards were also gone.

Pamela McGinnis, a forensic chemist with the Harris County Medical Examiner's Office, discovered semen stains on the left leg and crotch of McCormick's pants. *Id.* at 120-26. Assistant Harris County Medical Examiner Dr. Tommy J. Brown performed the autopsy. He found stab wounds on McCormick's hands, back, chest, and abdomen. Sperm was present in McCormick's mouth and vagina. Dr. Brown concluded that McCormick died from two stab wounds to her chest and one to her abdomen. *Id.* at 127-56.

Police obtained records tracking the use of the stolen credit cards belonging to Ringer and her husband. The cards had been used a number of times. The sales slips were signed

"Billy R. Ringer," the name of McCormick's father and Mary Jane Ringer's husband. 28 Tr. at 170-99. At trial, the woman who was Griffith's girlfriend during the period after McCormick's murder, testified that she saw Griffith with certain items, and that Griffith gave her other items, which matched items purchased with the stolen credit cards. The girlfriend also identified a knife the police had recovered as one that Griffith kept under the seat in his car. Another ex-girlfriend provided testimony that linked charges on the stolen credit cards to meals Griffith bought her at restaurants, charges for hotels where they stayed, and items he bought her. Employees of two of the restaurants identified Griffith as a patron on dates that corresponded to the charges on Ringer's credit cards and testified that Griffith had paid with one of the Ringer's credit cards. *Id.* at 213-58; 29 Tr. at 273-92. A handwriting expert testified that the signatures on all the credit card slips were made by the same person. *Id.* at 316-20.

Police tracked Griffith to a motel, where he was registered under the name "Billy Ringer." In a search of the room incident to Griffith's arrest, police found a wallet containing his driver's license, social security card, and the Ringers' credit cards. They also found a knife hidden between the bed and box spring. *Id.* at 322-82. The police found a receipt from McCormick's flower shop in Griffith's car. *Id.* at 383-88. Forensic tests revealed the presence of both McCormick's and Griffith's DNA on the knife. Tests also showed that Griffith's DNA was in McCormick's mouth and in the semen stains on her

pants. *Id.* at 390-450. Hairs recovered from McCormick's body matched a hair sample taken from Griffith. 29 Tr. at 294-308. The jury found Griffith guilty of murdering McCormick during the course of robbing her, a capital offense. 30 Tr. at 489.

During the penalty phase of the trial, the State presented evidence that Griffith was a former Harris County Sheriff's Deputy; that he had a poor reputation for being peaceful and law-abiding; and that he had a volatile temper. Griffith was fired from the Sheriff's Department following a misdemeanor conviction for domestic abuse. 31 Tr. at 493-566.

Two of Griffith's ex-wives and two ex-girlfriends testified that he was angry and physically and verbally abusive toward them and was extremely possessive and controlling. One ex-wife testified that he also became violent with their children. The State also presented evidence that Griffith committed unadjudicated offenses. These included a bank robbery in which he shot a teller in the back of the head, and a robbery of a bridal shop in which he sexually assaulted the sales clerk. *Id.* at 594-32 Tr. at 778.

The defense presented evidence that Griffith's mother favored his brother during their childhood, and that she had a drinking problem. When she was drunk, she would become angry and violent. 33 Tr. at 786-98. The defense elicited testimony about numerous awards and praises Griffith received from supervisors and people in the community. Former colleagues with the Harris County Sheriff's Department testified that Griffith was highly competent and professional and a compassionate and considerate supervisor and friend, who had helped save a colleague's life when they were together on a vacation. These witnesses also testified that Griffith looked devastated after being fired. *Id.* at 822-90; 1016-34 Tr. at

1047.

The jury also heard evidence relevant to future dangerousness. Dr. Toby Meyers, the Director of the Pivot Project, a program for people who have engaged in violence against an intimate partner, testified that he had worked with Griffith through the program. When Griffith entered the program, he acknowledged that he had a problem as a domestic abuser. Griffith worked hard in the group and Dr. Meyers believed that he benefitted from it. 33 Tr. at 899-912.

Edward Friechman, a clinical psychologist, evaluated Griffith. He concluded that the Pivot Program was not successful with Griffith because it was not sufficiently intensive. Dr. Friechman concluded that Griffith had either or both borderline personality disorder and dissociative disorder. Borderline personality disorder is commonly caused by childhood abuse or neglect. Dr. Friechman testified that Griffith's violence toward his wives and girlfriends was triggered by actions that reminded him of his neglectful mother. Dr. Friechman found that Griffith's identity had been connected to being a police officer, that his job was the "glue" that held him together emotionally, and that when he lost his job, his sense of reality became chaotic, resulting in intense anger. The structure of prison life gave Griffith a new kind of "glue," although Dr. Friechman conceded that Griffith would be dangerous if he ever escaped. 33 Tr. at 923-1016.

Dr. David Hopkinson, another clinical psychologist, also evaluated Griffith. Dr. Hopkinson found that Griffith behaved normally in structured situations, but overreacted to stimuli in less structured environments. As a result, Griffith is extremely suspicious and

distrustful of others and very uncomfortable when not in control. Dr. Hopkinson concluded that Griffith has borderline personality organization, meaning that he has intense and volatile relationships and tends to view people in "black and white" terms. Dr. Hopkinson testified that the parental neglect Griffith suffered as a child created a need to be in control and an inability to articulate his needs, which led to Griffith's violence toward women. Dr. Hopkinson concluded that Griffith was dangerous outside a structured environment, and would be dangerous if he escaped from prison. 34 Tr. at 1062-1122. Psychiatrist Dr. Mitch Young agreed with the diagnosis of borderline personality disorder and opined that Griffith functioned normally in highly-structured situations. Because of this, and because he would have no contact with women in prison, Young concluded that Griffith would not be dangerous in prison. 34 Tr. at 1123-57.

The State called Alan C. Brantley, a psychologist with the FBI. Brantley investigated Griffith's background, including his crimes, and concluded that Griffith posed a high risk of committing future acts of violence. He opined that a sexual predator such as Griffith would prey on weaker individuals and, if isolated from women, would prey on weaker men. *Id.* at 1177-95.

Billy Ringer, Jr., the brother of Debra McCormick and son of Billy and Mary Ringer, also testified. He described the effect on the different family members of losing Debra. His testimony included a description of Debra's relationship with her father, who had been diagnosed with stomach cancer eight to ten months before Debra's murder. She spent a lot of time caring for her ill father. Before Debra died, it looked as if the cancer would not be

fatal. After the murder, Debra's father weakened and died. Billy, Jr. testified that his father "gave up" after the murder. *Id.* at 1220-26.

The jury found a probability that, if sentenced to life imprisonment, Griffith would commit future acts of criminal violence that would constitute a continuing threat to society, and that the mitigating evidence was not sufficient to justify a life sentence. 35 Tr. at 1312-13. The trial court sentenced Griffith to death. *Id.* at 1314. The Texas Court of Criminal Appeals affirmed Griffith's conviction and sentence. *Griffith v. State*, 983 S.W.2d 282 (Tex. Crim. App. 1998), *cert. denied*, 528 U.S. 826 (1999), and denied Griffith's petition for a writ of habeas corpus. *Ex Parte Griffith*, No. 56,987-01 (Tex. Crim. App. Oct. 8, 2003). Griffith filed this federal habeas petition on October 7, 2004.

## II.     The Applicable Legal Standards

### A.      The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based on claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on

whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom., Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'"). The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

**B.    The Standard for Summary Judgment in Habeas Corpus Cases**

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000). Insofar as they

are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases. *See* Rule 11 of the Rules Governing Section 2254 Cases. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). Where, however, a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981). In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

## III. Analysis

Griffith asserts five claims for relief:

1) Allan Brantley's testimony violated Griffith's Eighth and Fourteenth Amendment rights;

2) the trial court violated Griffith's Sixth and Fourteenth Amendment rights by refusing to appoint and fund an expert to rebut Brantley;

3) the admission of victim impact testimony violated Griffith's Eighth and Fourteenth Amendment rights;

4) the trial court's refusal to inform the jury about Griffith's parole eligibility if sentenced to life violated his Eighth and Fourteenth Amendment rights; and

5) Griffith's conviction and sentence violate the Fourteenth Amendment because they are based on physical evidence developed by the scandal-ridden Houston Police Department ("HPD") Crime Lab.

Each claim is addressed below.

## A. The Claim as to Brantley's Testimony

A key component of the defense theory at sentencing was that Griffith's crimes were motivated by misogyny, that he would have no contact with women in prison, and that he would therefore pose no future danger if sentenced to life imprisonment. The State called Allan Brantley to rebut this theory. Brantley opined that Griffith is a sexual predator and, if denied contact with women, would prey on weaker men. In his first claim for relief, Griffith claims that this testimony invited a harsher sentence based on an unsubstantiated claim that he is homosexual. Respondent argues that this claim is procedurally defaulted and lacks merit.

### 1. Procedural Default

"When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998) (citing *Coleman*, 501 U.S. at 750-51); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

Respondent argues that, while Griffith raised three claims concerning Brantley's testimony on direct appeal, none of those claims raised the specific issue Griffith asserts here or relied on the case law Griffith now cites. The AEDPA requires that a prisoner exhaust his available state remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds. [A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) (An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not

be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .).

Griffith did not present this claim to the Texas state courts. The claim is not exhausted. Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). A federal court may dismiss an unexhausted claim with prejudice if, on the merits, pursuing it in the state forum would be futile. Griffith's claim is therefore examined on the merits.

2. *Dawson* and *Lawrence*

In *Dawson v. Delaware*, 503 U.S. 159, 165 (1992), the Supreme Court held that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Any such evidence, however, must be relevant to the sentencing proceeding. *Id.* Griffith argues that under *Lawrence v. Texas*, 539 U.S. 558 (2003), homosexual conduct is constitutionally protected, and that Brantley's testimony invited the jury to impose a death sentence based on lawful conduct. Griffith badly misconstrues *Lawrence*.

*Lawrence* held that the Equal Protection Clause bars a state from criminalizing sexual conduct between persons of the same sex when the state does not bar similar conduct by heterosexual couples. *Lawrence* also held that homosexuals have a Fourteenth Amendment privacy right to engage in private, consensual sexual conduct. Brantley did not argue or

13

imply that Griffith should be sentenced to death because he is homosexual; indeed, Griffith correctly notes that there is no evidence that he is homosexual or has ever engaged in a homosexual act. Rather, Brantley opined that Griffith would present a threat to the prison population because he is a sexual predator who, in the absence of women, would turn on other prey. Brantley gave his expert opinion that Griffith is likely to sexually assault fellow inmates. While private, consensual homosexual conduct may be constitutionally protected under *Lawrence*, sexual assault is not. In this case, it is the likelihood of sexual assault, not the fact that it may be same-sex, that was the subject of Brantley's testimony. *Lawrence* and *Dawson* do not provide a basis to find constitutional error in the evidence presented. This claim is without merit, making dismissal with prejudice appropriate.

### B.     The Claim of the Failure to Appoint an Expert to Rebut Brantley

Griffith moved the trial court to appoint and fund Dr. Theodore Blau as a defense expert. The motion was based on Griffith's belief that Brantley would testify to Griffith's future dangerousness based on a diagnostic technique that Dr. Blau would have testified was unreliable. The trial court denied the motion. In his second claim, Griffith argues that this decision denied him both his Fourteenth Amendment right to due process of law and his Sixth Amendment right to confront the witnesses against him.

The Texas Court of Criminal Appeals discussed the relevant facts in denying Griffith's direct appeal:

> The record reflects that appellant filed a motion on November 1, 1995, requesting the appointment of psychiatrist Mitchell Young and psychologist Ed Friedman. The trial court granted

this request, but limited the funds available to $6,000.00. According to Dr. Young's letter to defense counsel, psychologist David Hopkinson would also be helping with the case. On November 22, 1995, appellant filed two additional motions requesting the appointment of "expert assistance." Each of these motions specifically asked for the appointment of psychologist Dr. Theodore Blau. Appellant urged his motion be granted because Blau was needed to respond to State's expert, FBI Special Agent Dr. Allan Brantley, who was going to use a "threat assessment technique" (apparently similar to a future dangerousness analysis) and "compare the defendant to profiles of certain serial killers and discuss [appellant's] similarity to such individuals." Blau was apparently needed to show why such testimony was not "scientifically validated" and should, therefore, be held inadmissible. No affidavits or other evidence of need were included with the motion.

In considering the motion prior to trial, the trial judge asked appellant whether, if she granted his motion and appointed Blau, Blau was going to listen to Brantley's testimony. Appellant responded that he did not think so. The judge also asked appellant why one of the psychologists or the psychiatrist that had already been appointed could not rebut Brantley's testimony. Appellant responded that Brantley's testimony was not psychological in nature, but instead was based upon a forensic analysis. Appellant asserted that Blau was necessary because he was one of the people who developed the techniques about which Brantley would be testifying and he was the only non-FBI person counsel was aware of who utilized them. The judge overruled his request.

Prior to Brantley's testimony at punishment, the trial court held a hearing pursuant to Texas Rules of Criminal Evidence 702-705 to determine Brantley's qualifications and the bases for his testimony. Brantley told the judge that he was going to render an opinion on appellant's probability for being a future danger and that he was going to base that opinion upon crime scene photographs, investigative reports, interviews, autopsy photographs, school records, work records, and "everything that [he] could get [his] hands on." Brantley stated that he was not testifying from a psychological perspective per se, but rather

from his experience in the criminal justice field. Brantley also told the judge that he did not intend to use the "profiling" technique of which appellant complained. Appellant challenged Brantley's testimony asserting that it was based on novel methodology and was cumulative because the State had established the same information through the cross-examination of appellant's experts. The judge held the testimony admissible. After Brantley's testimony, appellant re-urged his motion to be allowed to hire Dr. Blau. However, the judge also overruled this request.

*Griffith v. State*, 983 S.W.2d 282, 285-86 (Tex. Crim. App. 1998), *cert. denied*, 528 U.S. 826 (1999). The Court of Criminal Appeals denied relief on the ground that the trial judge was reasonable in refusing Griffith's request for a third psychological expert. *Id.* at 286-87.

1.    Due Process

The trial judge concluded that Dr. Blau's testimony was not necessary to rebut Brantley's testimony both because Brantley stated that he would not give testimony based on the technique in which Blau is an expert, and because Griffith stated that Blau would not even listen to Brantley's testimony. The Texas Court of Criminal Appeals determined that the trial court's ruling was reasonable.

An indigent defendant is entitled to funding for expert assistance is necessary to provide "an adequate opportunity to present . . . claims fairly within the adversary system." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (quoting *Ross v. Moffitt*, 417 U.S. 600 (1974)). A petitioner is entitled to habeas relief based on the denial of expert assistance only if he establishes a reasonable probability that the expert would have assisted the defense or that the denial of such expert assistance resulted in a fundamentally unfair trial. *Yohey v. Collins*,

16

985 F.2d 222, 227 (5th Cir. 1993). The specific issue in which Blau is an expert did not come up in Brantley's testimony. Blau's testimony was not necessary to "provide an adequate opportunity" for Griffith to rebut Brantley. *Ake*, 470 U.S. at 77. The rulings of both the state trial court and the Texas Court of Criminal Appeals were not unreasonable applications of clearly-established federal law. The findings are entitled to deference.

2.    Ineffective Assistance of Counsel

To prevail on his claim for ineffective assistance of counsel, Griffith

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). As noted above, Blau's testimony presented nothing relevant that Griffith's other psychological experts could not address. At a minimum, the trial court's decision not to provide funding for Blau caused Griffith no prejudice.

3.    Confrontation

Griffith also argues that his inability to retain Blau violated his Sixth Amendment right to confront Brantley. The Sixth Amendment guarantee of a criminal defendant's right to confront witnesses against him includes the right to cross-examination, but this right is subject to the wide latitude of trial judges to impose reasonable limits. *See Davis v. Alaska*, 415 U.S. 308, 315 (1974) (stating that the right to cross-examination is "[s]ubject always to

the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation"); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Confrontation Clause does not guarantee defendants an unlimited right to cross-examination. *Van Arsdall*, 475 U.S. at 678. As discussed above, Blau had nothing relevant to offer that could not be presented through the testimony of Griffith's other two psychological experts. The trial court's decision was reasonable under the circumstances and did not violate clearly-established law governing Griffith's confrontation rights.

### C.       The Claim as to the Victim Impact Testimony

In his third claim for relief, Griffith argues that Billy Ringer, Jr.'s testimony was so emotionally inflammatory that it violated his Eighth and Fourteenth Amendment rights. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not bar the admission of testimony by those affected by the defendant's crime. The Court reasoned that "the consideration of the harm caused by the crime [is] an important factor in the exercise of [sentencing] discretion." *Id.* at 820. Victim impact testimony informs the jury of the degree of harm the crime caused. *Id.* at 824-25. Griffith argues that the testimony about Billy Ringer, Sr.'s death from cancer was so inflammatory that "the jury was invited to sentence Mr. Griffith for committing a double murder."

The testimony in this case was no more emotionally charged than that admitted in *Payne*. In that case, the mother and grandmother of the two murder victims testified that her surviving grandson, who was three years old at the time of the murders, continued to cry for his dead mother and did not understand why she did not come home. He also cried for his

dead little sister. *Id.* at 814-15. While Griffith points out the emotional nature of the testimony, he points to nothing but his own speculation that the testimony was factually inaccurate. In the absence of evidence that the victim impact testimony was false or misleading, it was clearly admissible under *Payne*.

### D. The Claim of the Refusal to Inform the Jury about Parole Eligibility

In his fourth claim for relief, Griffith argues that the trial court's failure to instruct the jury on the number of years he would have to serve in prison before becoming eligible for parole under a life sentence violated his Eighth and Fourteenth Amendment rights. Griffith primarily relies on the United States Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154 (1994).

*Simmons* involved a South Carolina law that a capital defendant to be sentenced to life in prison without the possibility of parole. In *Simmons*, the defense sought an instruction informing the jury that a sentence of life imprisonment would carry no possibility of parole, but the trial court refused. The Supreme Court held that when "the alternative sentence to death is life without parole . . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court." *Simmons*, 512 U.S. at 169 (citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977)). The *Simmons* court reasoned that when a state imposes the death penalty on the premise that the convicted individual poses a danger to society, the fact that the defendant may receive life without possibility of parole "will necessarily undercut the State's argument regarding the threat the defendant poses to society." *Simmons*, 512 U.S.

at 169.  To hold otherwise would create a "false dilemma by advancing generalized argument regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole."  *Id.* at 171.

*Simmons* addresses very specific circumstances.  When the State seeks the death penalty at least in part on the ground that the defendant will be a future danger to society, and when the alternative to a sentence of death is a sentence of life imprisonment without the possibility of parole:

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society.  Because truthful information of parole ineligibility allows the defendant to deny or explain the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

*Simmons*, 512 U.S. at 168-69 (internal quotation marks and citation omitted); *see also*, *Wheat v. Johnson*, 238 F.3d 357, 361-62 (5th Cir.), *cert. denied*, 532 U.S. 1070 (2001).  While the State did seek a death sentence in this case partially on the basis that Griffith would pose a continuing threat, the jury's alternative was a parole-eligible life sentence, not, as in *Simmons*, life without parole.  *Id.* at 168 n.8.  The *Simmons* case does not support the argument Griffith makes.

The Fifth Circuit has repeatedly rejected this claim:

> [T]he Supreme Court took great pains in its opinion in *Simmons* to distinguish states such as Texas, which does not provide

> capital sentencing juries with an option of life without parole,
> from the scheme in South Carolina which required an instruction
> on parole eligibility . . . [T]he Fifth Circuit has repeatedly
> refused to extend the rule in *Simmons* beyond those situations in
> which a capital murder defendant is statutorily ineligible for
> parole.

*Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999);

*see also*, *Wheat*, 238 F.3d at 361-62 (5th Cir.), *cert. denied*, 532 U.S. 1070 (2001) (finding

*Simmons* inapplicable to the Texas sentencing scheme); *Soria v. Johnson*, 207 F.3d 232 (5th

Cir.), *cert. denied*, 530 U.S. 1286 (2000) (finding that "reliance on *Simmons* to demonstrate

that the Texas capital sentencing scheme denied [petitioner] a fair trial is unavailing"); *Miller*

*v. Johnson*, 200 F.3d 274, 290 (5th Cir.) ("because Miller would have been eligible for parole

under Texas law if sentenced to life, we find his reliance on *Simmons* unavailing") (internal

quotation marks and citation omitted), *cert. denied*, 531 U.S. 849 (2000); *Hughes v. Johnson*,

191 F.3d 607, 617 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000); *Muniz v. Johnson*, 132

F.3d 214, 224 (5th Cir.) (stating that a claim based on *Simmons* "has no merit under the law

in our circuit"), *cert. denied*, 523 U.S. 1113 (1998); *Montoya v. Scott*, 65 F.3d 405, 416 (5th

Cir. 1995) (holding that *Simmons* claims are foreclosed by recent circuit authority rejecting

an extension of *Simmons* beyond situations in which a defendant is statutorily ineligible for

parole"), *cert. denied sub nom. Montoya v. Johnson*, 517 U.S. 1133 (1996); *Allridge v. Scott*,

41 F.3d 213, 222 (5th Cir. 1994) (stating that "*Simmons* is inapplicable to this case"), *cert.*

*denied*, 514 U.S. 1108 (1995); *Kinnamon v. Scott*, 40 F.3d 731, 733 (5th Cir.) (refusing to "extend *Simmons* beyond cases in which the sentencing alternative to death is life without parole"), *cert. denied*, 513 U.S. 1054 (1994).

Griffith argues that Fifth Circuit precedent conflicts with *Simmons*. In *Ramdass v. Angelone*, 530 U.S. 156 (2000), however, the court made clear that the Fifth Circuit has correctly applied the *Simmons* holding. "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.* at 169. In this case, life without parole was not a possibility. Griffith faced one of two sentences: death, or life imprisonment with the possibility of parole at a future date. This case does not fall within the scope of *Simmons*.

### E.    The Claim of Due Process and the Problems with the Houston Police Department Crime Lab

The State's case against Griffith rested in part on DNA evidence developed by the HPD Crime Lab. Since Griffith's conviction, serious flaws in the crime lab's handling of DNA evidence have come to light. In his fifth and final claim, Griffith argues that crime lab personnel knew these problems and that the State's failure to disclose the problems violated due process.

#### 1.    Procedural Default

Respondent first argues that this claim is unexhausted and procedurally defaulted. It is true that Griffith never presented this claim to the Texas state courts. For the reasons discussed below, however, the claim is dismissed.

2. Due Process

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The question is not whether disclosure would have made the result different. Rather, the question is whether given the failure to disclose material evidence, the verdict is not worthy of confidence.

In *Strickler v. Greene*, the Supreme Court framed the essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks*, 124 S. Ct. at 1272 (quoting *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it. Rather, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 124 S. Ct. 1256, 1272 (2004) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

While evidence of significant problems with the HPD crime lab became public in the last few years, Griffith presents no evidence that public officials were aware of these problems in 1995, when he was tried and convicted. A petitioner's speculation about the suppression of exculpatory evidence is insufficient basis to support a *Brady* claim. *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999).

Moreover, respondent points out that subsequent testing of the DNA evidence used against Griffith, performed by an independent laboratory during Griffith's state habeas corpus proceeding, supports at least some of the HPD crime lab's findings. The later testing showed that the likelihood that the sperm found on McCormick's pants belonged to someone other than Griffith is less than 1 in 250,000. (Appendix A to Respondent's Motion for Summary Judgment at 2-3). In light of the quantity and strength of other evidence of Griffith's guilt, including his possession and use of the stolen credit cards, his possession of a knife matching McCormick's wounds, and the presence of a receipt from McCormick's shop in Griffith's car, the information about crime lab errors does not make the verdict less worthy of confidence.

## IV.    Certificate of Appealability

Griffith has not requested a certificate of appealability ("COA"), but this court may determine whether he has met the standards for issuance. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").

A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has ruled on it. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This court has carefully considered each of Griffith's claims. While the issues Griffith raises are important and deserve the closest scrutiny, this court finds that each of the claims is foreclosed by clear, binding precedent. This court concludes that under such precedents, Griffith has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As to the claims that have been dismissed on procedural grounds, this court concludes that jurists of reason would not find it debatable whether the petition states valid grounds for relief and would not find it debatable whether this court is correct in its procedural determination. This court concludes that Griffith is not entitled to a COA.

## V.    Conclusion and Order

Respondent Doug Dretke's Motion for Summary Judgment (Document No. 11) is GRANTED and Griffith's Petition for a Writ of Habeas Corpus (Document No. 8) is dismissed. A Certificate of Appealability is not issued. Final judgment is entered by separate order.

SIGNED on September 27, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge